## Chapman's Exr., et al. v. Chapman, et al.

(Decided February 19, 1913.)

### Appeal from Simpson Circuit Court.

1   Wills—Simultaneous Execution by Father and Son—Parol Contract at Time of Making—Subsequent Marriage of Father.—Where

a father and son acted in concert in making their wills, and at the time entered into a parol agreement that the father should will the land devised him by his son equally to the three children of another deceased son, they being the only heirs, except the wife of the father, who subsequently died, an enforcible parol trust was created to the extent of embracing the land devised by the son, and to this extent the contract should be enforced, but it would be inequitable and unjust to the surviving widow and infant child to fully enforce the contract as the rights of neither of these parties had intervened at the time it was made, but the annulling of the will by the subsequent marriage did not extinguish the trust in so far as the devise by the son is concerned.

2. Wills—Subsequent Marriage and Subsequent Will—Anulling of Will Did Not Extinguish Trust.—Whether the original will was annulled or not by the re-marriage, it was annulled by testator's later will, but the annulling of that will did not extinguish the trust created by the contract between the father and son, and any effort that the father may have made to dispose of the property by will which he merely held in trust, was of no avail.

ROARK & FINN, for appellants.

J. J. MILLIKEN, WHITESIDES & EVANS, for appellees.

OPINION OF THE COURT BY JUDGE TURNER.—Affirming on original and reversing on cross appeal.

In 1895 Arch Chapman was a prosperous farmer of Simpson county, and owned about two hundred acres of land; his son, John Will Chapman, a young man about twenty-nine or thirty years of age, who had never married, was the owner of about one hundred acres of land adjoining that of his father.

John Will Chapman was in very delicate health, being afflicted with tuberculosis, and it was known and recognized by him and all of his family that he could live but a short time. Arch Chapman had no other child living, but his deceased son, Thomas Chapman, had left three children, Edwin, Lulu and Virgil. Under these conditions Arch Chapman and John Will Chapman each made their wills dated on the first day of October, 1895, both written at the same time, by the same man, and attested by the same witnesses.

In about two or three weeks after their execution John Will Chapman died, and his will was duly probated and his father being the sole devisee therein took possession of his land, and held and used it as his own until his death. The wife of Arch Chapman was living at this time, and survived her son John Will Chapman some eight years. At the time these wills were executed the

three children of Thomas Chapman, deceased, were the only heirs at law, either of Arch Chapman or John Will Chapman, other than the parties named; and the evidence discloses beyond question, that both of them were particularly solicitous about the welfare of these children, and were anxious that they should finally have all their property in as nearly equal portions as possible.

John Will Chapman devised all of his property absolutely to his father, and Arch Chapman after providing for his wife, devised all of his property including the John Will Chapman land about equally to the three children of Thomas Chapman, specifying in detail the particular part of the land intended for each.

During the life time of Arch Chapman's first wife and about the year 1902, Edwin, the oldest one of the children, having become of age and married, his grandfather conveyed to him about one-third in value of the three hundred acres; not conveying to him, however, that part of the land which was set apart to him in the will made on the first of October, 1895, but nevertheless manifesting upon the part of Arch Chapman a plain purpose to carry out the contract or agreement between him and John Will Chapman, which we will hereafter consider.

Some time thereafter the wife of Arch Chapman died, and about a year later he married Minnie Chapman, and there was born to them a son, the appellant, Joseph Granville Chapman.

Arch Chapman lived until 1910 when he died, and left a will by which he gave to his wife, Minnie Chapman, all of his property, for life, and in remainder to the infant appellant, Joseph Granville Chapman.

In 1911, appellee, Lula Chapman, instituted this action against the executor of her grandfather's estate, and his devisees, in which she alleged that her grandfather, Arch Chapman, had at the time and previous to the execution of their wills on the first of October, 1895, agreed and contracted with her uncle, John Will Chapman, that in consideration of John William willing his landed estate to Arch Chapman, that he (Arch Chapman), would will the same to her (Lula Chapman), and that in fact, he had simultaneously therewith executed his own will, by which he devised said property to the plaintiff; but that thereafter in violation of said solemn contract and agreement, he had undertaken to devise the same to his last wife and her infant child.

The executor and the devisees denied in their answer that any such contract or agreement had ever been made, and the issues being made up the parties took considerable evidence.

In the progress of the litigation, Virgil Chapman was made a party defendant, and filed his answer and cross-petition setting up the same contract that his sister had, and alleged that under the agreement between his uncle and his grandfather, he was to have a certain tract of land, but that thereafter, Arch Chapman and his wife had conveyed to Edwin Chapman the part of the tract which it was agreed between Arch and John William, that he (Virgil), should have, and for that reason, there could not be a specific performance of the contract as to that tract of land; and in lieu thereof, he prayed for a judgment against his grandfather's estate for the value thereof.

Lulu Chapman in her petition prayed for a specific performance of the contract, and for a judgment adjudging her to be the owner of the John Will Chapman tract of land, that being the land set apart to her in the agreement.

Without going into the evidence in detail, it is sufficient to say that several witnesses testified that both Arch and John William Chapman had told them, that this was the agreement between them, and that they had carried out that understanding by the execution of their wills made at the same time; and this evidence is corroborated by all of the facts and circumstances surrounding the transaction. The three children were at the time the special objects of their solicitude; as a part of the agreement they provided for the erection of certain improvements on one part of the land so as to make it equal in value to the other two parts; contracts looking to the erection of these improvements were made in the lifetime of John William Chapman and carried out by his father after his death; the fact that Arch Chapman after the marriage of Edwin conveyed to him about one-third in value of the real estate is most convincing that it was done in accordance with some previous arrangement; the attorney who prepared the two wills, while he states that he knew of no such agreement, does say that Arch Chapman a few days previously had made an engagement for him to come to his home and write his will, and told him

at the same time that his son, John Will, also wanted a will prepared.

The direct testimony, strengthened by these circumstances, is conclusive that Arch Chapman and John Will Chapman in the making of their wills were acting in concert, and under an agreement between them.

As against all this positive and circumstantial evidence, we have only the negative testimony of a number of witnesses, who state in substance, that they knew of no such arrangement.

The Chancellor below, we think properly held that Arch Chapman took the title to John Will Chapman's land under such a contract.

Pending the action, the parties all agreed to the sale of the lands, and the executor of Arch Chapman in accordance therewith sold same and holds the funds subject to the order of the court. The lower court adjudged to each Lulu and Virgil Chapman one-third of the proceeds of the John Will Chapman land, and both parties appeal.

Appellants insist: 1. That the evidence of the alleged parol contract is insufficient to establish it, and that if it did, it is unenforcible.

2. That the parol testimony is incompetent to contradict any express provisions of the will.

3. That under our statute the first will of Arch Chapman was revoked by his second marriage, and that therefore, none of its provisions could be enforced.

4. That on account of the changed conditions and surroundings of Arch Chapman by reason of his second marriage and the birth of his infant son, it would be inequitable and unjust to enforce the alleged parol trust.

1. We have already seen that the evidence establishes the contract between Arch and John William Chapman, and the question is, does that contract constitute an enforcible parol trust. Fortunately we have recently had that question before this court, and it has been carefully and exhaustively dealt with in Becker v. Neurath, 149 Ky., 421. That was a case in which a man conveyed to his second wife the absolute title to a house and lot in the city of Louisville with a parol agreement between them, that at her death she would give it to his children by a former marriage, and the court in dealing with the precise question which we have seen in this case, except that one was a deed and the other a will, said:

"Upon this point the argument is made that before equity will lend its aid to enforce a parol constructive trust, it must be shown by satisfactory evidence that the grantor was induced to make the conveyance with the parol trust attached by the actual fraud of the grantee. Or, to put it in another way, that it must be shown by convincing evidence that the grantee by false representations or other fraudulent means, obtained the title without intending to carry into effect the express wish of the grantor in making the conveyance. That there are a few decisions supporting this contention may be admitted, but the tendency of the modern cases and the great weight of authority is to enforce a trust of this character when it is shown that it would be unconscientious to permit the grantee to hold the estate in violation of the promise, although there may be no evidence of actual fraud on the part of the grantee in obtaining the conveyance. It is true that the doctrine of constructive trusts rests upon the ground that the grantor has been induced to part with his title by the fraud of the grantee, but it does not follow from this that it is necessary to show by fact or circumstance actual, intentional fraud practiced at the time by the grantee. When the grantee by act or word has induced the grantor to make the conveyance under an agreement or promise that certain parol conditions attached to it will be complied with, the law will imply a fraud from the failure of the grantee to perform the annexed conditions. If A. tells B. that he will take the title to property and hold it for the use and benefit of some other person, and by reason of this promise, B. is induced to and does convey the title, A. will be deemed to have practiced a fraud upon B. if he fails to observe the promise under which he obtained the conveyance. It is the end that the law looks at, and not the means by which this end is accomplished. If a grantee is enabled to obtain the title to property by an express promise to hold it for the use of another, and he fails to observe the promise, he is in fact and truth as much guilty of fraud as if by deceit, persuasion, cunning, or other evidence of actual fraud, he had obtained that which otherwise would not have come to him. No matter whether the grantee secured the property by what may be termed legal or constructive fraud, or by actual fraud, if he fails to make that disposition of the property that the grantor intended he should make and that he agreed to make, the person

who, except for the promise, would have been the beneficiary of the estate, had been defrauded of that which was justly due him. To say that a grantee who by misrepresentations, deceit, or undue influence, obtains the title to property under a promise that he will hold it for certain uses, will be compelled by equity to perform the trust, but that the grantee who merely promises the grantor that he will hold the title for certain purposes, and upon his promise the grantor is induced to convey it, will not be required to perform the trust, would be to make a distinction without a difference and one that would often result in gross injustice."

The court in that case has so clearly and accurately discussed this question of constructive trust, as that it seems entirely unnecessary to further notice it.

2. Counsel seems to be under the impression that it was the purpose of the testimony going to establish the parol contract between John Will and Arch Chapman to contradict the provisions of Arch Chapman's last will; but in fact that was not the purpose of it. Its sole object was to establish the previous contract in pursuance of which the first will was made, and to thereby show, that the trust existed. There was no attempt whatever to contradict the provisions of Arch Chapman's will.

3. It is insisted that the second marriage of Arch Chapman, under provisions of section 4832 of the Kentucky Statutes, annulled his will made on the first of October, 1895; and of this there can be no doubt, but this is not an action to enforce the provisions of that will; it is an action to have it adjudged that by reason of the contract made between him and John Will Chapman previous to the making of that will, he held the lands in trust. It is perfectly immaterial for the purposes of this case whether that will was annulled; even if it had not been annulled by his remarriage, it was certainly annulled by the execution of his later will. Any effort by him to dispose of by will the property which he merely held in trust except in such way as to carry out the trust, would be of no avail. The annulling of the will did not extinguish the trust.

4. We agree with counsel that it would be inequitable and unjust to the surviving widow and infant child under the conditions in this case, to fully enforce the contract made between Arch and John Will Chapman. That contract was made at the time when the rights of neither

of these innocent parties had intervened, and consequently, they could not have been considered in it. But their intervening equities should be considered only in relation to the land originally owned by Arch Chapman, and should in no way be permitted to defeat the manifest purpose of John William Chapman to put his land in trust so that the children of his deceased brother would ultimately get it. John Will Chapman was dead and this solemn trust was created by him, before the rights of either of these appellants had accrued. It was not unnatural or improper for Arch Chapman under the changed conditions that existed at or shortly prior to his death, to provide for them out of his own estate, but it would be manifestly inequitable to permit him to, in any way, transmit to them any part of the trust property which his son had willed to him under a solemn obligation to give to his brother's children.

By reason of the fact that the trust so far as Edwin Chapman is concerned has been fully executed, and he has received more than in equity he would be entitled to under the changed conditions, it seems impossible to do equal and exact justice between all the parties; but on the record as we find it, it is our opinion that judgment should be rendered adjudging to Lulu and Virgil Chapman each one-half of the proceeds of the sale of John Will Chapman's land.

On return of the case a guardian *ad litem* will be appointed for the infant defendant on the cross-petition of Virgil Chapman.

The judgment on the original appeal is affirmed, and on the cross-appeal the judgment is reversed for further proceedings consistent herewith.